Nos. 22-16914 & 22-16916

# United States Court of Appeals for the Ninth Circuit

IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

FRANK CUSTODERO, ET AL.,

*Plaintiffs-Appellees,*

v.

APPLE INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of California,
No. 5:21-md-02985-EJD (Hon. Edward J. Davila)

## PRINCIPAL BRIEF FOR APPLE INC.

<table>
<tr><td>

Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

</td><td>

Mark A. Perry
Zachary D. Tripp
Crystal L. Weeks
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

</td></tr>
</table>

*Counsel for Apple Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that Apple Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Introduction ................................................................................... 1

Statement of Jurisdiction ............................................................. 4

Statement of the Issue .................................................................. 5

Statute ........................................................................................... 5

Statement of the Case ................................................................... 5

    A.  Section 230 protects online platforms from liability for third-party content ................................................................. 5

    B.  The App Store platform and third-party apps ............................. 6

    C.  Plaintiffs spent money playing games on third-party apps .......... 9

    D.  Plaintiffs sue Apple to recover the money they spent ................ 11

    E.  Procedural history ...................................................................... 14

Standard of Review ..................................................................... 16

Summary of the Argument .......................................................... 17

Argument:

    Section 230 forecloses Plaintiffs' claims against Apple because they treat Apple as the publisher of third-party apps on the App Store ........ 24

I.  Section 230 prevents platforms from being held liable for third-party content ......................................................................... 25

II.  Plaintiffs' claims against Apple fail because they would hold Apple liable for third-party content on the App Store ...................... 29

    A.  Plaintiffs cannot circumvent Section 230 by alleging that Apple promoted third-party apps on the App Store ................... 31

    B.  Plaintiffs cannot circumvent Section 230 by alleging that Apple shared data with developers of third-party apps ............. 37

    C.  Plaintiffs cannot circumvent Section 230 by alleging that Apple processed transactions for virtual currency sold by developers within third-party apps ............................................. 39

        1.  Plaintiffs' payment-processing claims depend on third-party content ....................................................................... 40

        2.  *HomeAway* is inapposite and indeed supports Apple ............ 47

3. Allowing Plaintiffs' claims to proceed would undermine
Congress's stated purposes in enacting Section 230 .............. 53

4. The district court's contrary conclusion is unfounded ........... 57

Conclusion ................................................................................. 61

Certificate of Compliance ........................................................... 62

Statement of Related Cases ........................................................ 63

Certificate of Service ................................................................. 64

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*A.B. v. Facebook, Inc.*,
2021 WL 2791618 (C.D. Cal. June 1, 2021)..........................................38

*Apple, Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ...............................................................6, 55

*Atl. Marine Constr. Co. v. U.S. Dist. Ct.*,
571 U.S. 49 (2013) ....................................................................37

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ..........................................*passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................16

*Coffee v. Google LLC*,
2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ...........................21, 44, 45, 47

*Cubby, Inc. v. CompuServe Inc.*,
776 F. Supp. 135 (S.D.N.Y. 1991)..............................................53

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ...............................................26, 50

*Dyroff v. Ultimate Software Grp.*,
934 F.3d 1093 (9th Cir. 2019)...............................................*passim*

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in relevant part*,
67 F.4th 946 (9th Cir. 2023)......................................................7

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)................................................7, 55

*Fair Hous. Council of San Fernando Valley v.
Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc).......................................*passim*

*Fed. Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020)....................................28, 39

*Free Kick Master LLC v. Apple Inc.*,
140 F. Supp. 3d 975 (N.D. Cal. 2015)........................................26

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated and remanded*, 143 S. Ct. 1191 (2023) ....................................... 36, 57-61

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ....................................................................... 53

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) ..............................................*passim*

*In re Mastercard Int'l, Inc., Internet Gambling Litig.*,
  313 F.3d 57 (5th Cir. 2002) ............................................... 46, 59

*Jones v. Bock*,
  549 U.S. 199 (2007) .................................................................. 17

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) .................................................... 11

*Kimzey v. Yelp!, Inc.*,
  836 F.3d 1263 (9th Cir. 2016)...........................................*passim*

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ...................................... 20, 38, 39

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021)...........................................*passim*

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007)...........................................*passim*

*Reuter v. MasterCard Int'l, Inc.*,
  397 Ill. App. 3d 915 (2018) ...................................................... 46

*Spears v. Stewart*,
  283 F.3d 992 (9th Cir. 2001) .................................................... 35

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .............................. 53, 54

*Taylor v. Apple, Inc.*,
  2021 WL 11559513 (N.D. Cal. Mar. 19, 2021) ...................................... 45

*Twitter, Inc. v. Taamneh*,
  143 S. Ct. 1206 (2023) ....................................................... 30, 60

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Ritchie,*
  342 F.3d 903 (9th Cir. 2003) ................................................................. 7

*Yamaha Motor Corp., U.S.A. v. Calhoun,*
  516 U.S. 199 (1996) ............................................................................ 4

*Zeran v. Am. Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) .............................................................. 36

## Federal Statutes

Communications Decency Act of 1996, Pub. L. No. 104-104,
  Tit. V, 110 Stat. 113................................................................................ 1

  47 U.S.C. 230 ......................................................................*passim*

  47 U.S.C. 230(a)(1) .......................................................................... 5

  47 U.S.C. 230(a)(4) .......................................................................... 5

  47 U.S.C. 230(b)(1) ............................................................. 6, 55, 56

  47 U.S.C. 230(b)(2) ............................................................. 6, 55, 56

  47 U.S.C. 230(b)(3) ........................................................................ 53

  47 U.S.C. 230(b)(4) .................................................................... 6, 53

  47 U.S.C. 230(c)(1) ........................................................................ 56

  47 U.S.C. 230(c)(2) ........................................................................ 56

  47 U.S.C. 230(e)(1) ........................................................................ 26

  47 U.S.C. 230(e)(3) .......................................................................... 5

  47 U.S.C. 230(e)(5) ........................................................................ 27

  47 U.S.C. 230(f)(2) ........................................................................ 37

  47 U.S.C. 230(f)(3) ........................................................................ 26

  47 U.S.C. 230(f)(4) .................................................................. 19, 36

Racketeer Influenced and Corrupt Organizations Act,
  18 U.S.C. 1961-1968........................................................................ 12

18 U.S.C. 2333(d)(2) ............................................................................ 60

28 U.S.C. 1292(b)................................................................................... 4

28 U.S.C. 1331 ...................................................................................... 4

28 U.S.C. 1332(d)(2) .............................................................................. 4

# TABLE OF AUTHORITIES

**Page(s)**

28 U.S.C. 1367 ...................................................................... 4

**State Statutes**

Ala. Code § 13A-12-20(2) ..................................................... 58

Cal. Bus. & Prof. Code § 17200 *et seq.* ................................ 12

Conn. Gen. Stat. Ann. § 52-554 ..................................... 11, 41

Mo. Ann. Stat. § 572.010(2) ................................................ 58

N.Y. Penal Law § 225.00(9) ................................................. 58

**Miscellaneous**

Black's Law Dictionary (11th ed. 2019) ............................... 58

H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 194 (1996) ...... 54

Suzanne Daley, Making the Front Page: How All the News
    Fits in Print, N.Y. Times (Dec. 23, 2019) ................................ 36

## INTRODUCTION

Section 230 of the Communications Decency Act of 1996, 47 U.S.C. 230(c)(1), forecloses every cause of action asserted against Apple Inc. in Plaintiffs' Complaint. Section 230 preempts state-law claims that "treat[]" an internet platform as a "publisher" of third-party content available on that platform. *Id.* A claim treats a platform as a publisher if it "depend[s] on a third party's content, without which no liability could have existed." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021). That rule requires dismissal of the entire case.

Plaintiffs are trying to hold Apple liable for money they chose to spend playing games on third-party apps that are available on the App Store platform. The Complaint alleges that some third-party apps include games that resemble slot machines—but do not allow anybody to win any actual money. Instead, a player uses virtual "chips," a form of in-game currency, to enable virtual "spins," to possibly "win" more virtual chips. A player can also acquire more chips by buying them from the developer or simply waiting for additional free chips. But the player cannot cash out. No matter what, the player can never win any real money. The virtual chips are just that: virtual. They can only be used within a particular app.

Plaintiffs contend that those slot-simulation games qualify as illegal "gambling" in 16 States, and they demand that Apple reimburse them for

their so-called "losses," the real money that they chose to spend to acquire virtual chips that they used to play pretend slots. Even if those games could be considered illegal gambling in some States (a question not yet addressed in this litigation), Plaintiffs cannot hold Apple liable for the money Plaintiffs spent playing them. It is undisputed that Apple did not create the apps. Under Section 230, Apple therefore cannot be held liable for hosting them on the App Store—full stop.

The district court limited the initial round of motions practice to Section 230. Recognizing that the statute presents a significant barrier to their claims, Plaintiffs abandoned their core allegations that Apple could be held liable for "hosting" third-party apps and sought instead to use "creative pleading"—and, worse, arguments that went beyond the allegations in the Complaint—in an attempt to "circumvent [Section 230's] protections." *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1265-66 (9th Cir. 2016). For the most part, the district court saw through this gambit and correctly recognized that Section 230 forecloses Plaintiffs' claims. In particular, the court rightly concluded that Apple cannot be liable to Plaintiffs merely because it allegedly "promoted" certain apps or shared some user data with app developers.

The district court erred, however, in ruling that Apple could be held liable for the entire amount that Plaintiffs spent to play games because Ap-

ple allegedly processed in-app transactions in virtual currency between developers and consumers, taking its standard commission. The Complaint does not allege that Apple's in-app purchase mechanism is independently tortious or that it is unlawful to effect a transaction in virtual currency or other content (or to take a commission). There is no alleged gambling in that transaction, and no winner or loser. Consumers got exactly what they paid for: virtual currency. And the only way to connect Apple's otherwise lawful processing of in-app payments to allegations of illegality is via the content of the apps on the App Store: If the apps included different content, there would be no claim. The duty thus depends on content and therefore treats Apple as the publisher.

The order below rested on Plaintiffs' argument that "the Platforms['] role as a 'bookie' is illegal" (ER-35), but the Complaint does not actually allege that Apple is a bookmaker and the allegations belie that characterization. Plaintiffs do not allege that Apple booked any bets, set any odds, or "paid" any virtual winners. Indeed, it is undisputed that Apple is not a party to the allegedly unlawful exchange of virtual chips for virtual spins on the virtual slots; that is exclusively between the user and the app developer. Apple's facilitation of the earlier transaction in which the developer sold in-app currency does not make Apple liable for everything that later happens within the app.

Plaintiffs' sweeping theory also could cause grave harm to the Internet economy. It cannot be limited to gambling apps or even the processing of payments for virtual currency in video game apps. Rather, it would instead extend to processing payments on *any* app. Countless apps offer virtual currency, for a wide variety of in-app uses. Plaintiffs' theory thus would effectively expose Apple to suit for harms caused by content on any app that offers in-app purchases, not just the apps at issue in this case. Yet the core purpose of Section 230 was to avoid putting platforms in that position.

All of Plaintiffs' claims against Apple are barred by Section 230 because they seek to hold Apple, as the platform provider, liable for content created by others and hosted on the App Store. The Court should therefore reverse the order on interlocutory review insofar as it held otherwise, and remand with directions to dismiss the entire Complaint with prejudice.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. 1331, 1332(d)(2), and 1367. This Court has jurisdiction of this certified interlocutory appeal under 28 U.S.C. 1292(b). *See* ER-245-46. This Court's jurisdiction "applies to the order certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

## STATEMENT OF THE ISSUE

Whether Section 230 forecloses every cause of action asserted against Apple in the Complaint because the claims "treat[]" the App Store "as the publisher" of third-party content. 47 U.S.C. 230(c)(1).

## STATUTE

Section 230 (47 U.S.C. 230) is attached as an addendum.

## STATEMENT OF THE CASE

### A. Section 230 protects online platforms from liability for third-party content

Congress enacted Section 230 to immunize providers of interactive computer services from liability arising from content created by third parties. Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Congress also expressly preempted inconsistent state law: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. 230(e)(3).

Congress found that the Internet "represent[s] an extraordinary advance in the availability of educational and informational resources," and that platforms have "flourished" because of "minimum … government regulation." 47 U.S.C. 230(a)(1) and (4). Congress declared that "it is the policy of the United States" to "promote the continued development of the Internet

and other interactive computer services and other interactive media," to "preserve the vibrant and competitive free market that presently exists for the Internet" "unfettered by Federal or State regulation," and to "remove disincentives for the development and utilization of blocking and filtering technologies." 47 U.S.C. 230(b)(1), (2) and (4).

"The majority of federal circuits have interpreted [Section 230] to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (internal quotation marks omitted). "[C]lose cases … must be resolved in favor of immunity," this Court has explained, "lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc).

### B. The App Store platform and third-party apps

Plaintiffs seek to hold Apple liable for real money they spent on virtual currency they used to enhance their experience playing games created by third-party developers that are available on the App Store. ER-155-56. The App Store allows developers to distribute apps that users can download and

run on an iPhone or other iOS device. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 966-67 (9th Cir. 2023). "'There's an app for that' has become part of the 21st-century American lexicon," as the App Store "contains about 2 million apps," the vast majority of which third parties created and developed. *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1518-19 (2019). Thousands of apps offer virtual currency consumers can use within the app. *See* ER-119 (developer guidelines regarding in-app currency applicable to all apps).[1]

The App Store is a two-sided platform that connects app developers, on one side, with consumers, on the other. As relevant, Apple provides an in-app purchase system, or commerce engine, to enable certain transactions—including for paid downloads and in-app purchases of digital content—within apps distributed through the App Store. ER-119-20. The Complaint alleges that Apple "operates as the payment processor" for such transactions and charges developers a 30% commission. ER-152; ER-155 (¶¶ 63, 76); *see also* ER-87.[2] The platform also includes tools to facilitate

---

[1] The Court can take judicial notice of Apple's "Developer Program License Agreement," "App Review" and "App Store Review Guidelines" because they are incorporated by reference into the Complaint. *See, e.g.*, ER-152; ER-155; ER-157 (¶¶ 63 n.8, 76 n.14, 82 n.16, 83 n.17); *see also* ER-42 (plaintiffs declining to object to judicial notice); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[2] As a different district court recently explained, Apple "does not itself even process payments—that function is performed by a third-party settlement provider like Chase Bank with which Apple contracts." *Epic Games, Inc. v.*

developers' interaction with their users. *See* ER-157-58 (¶¶ 87, 89). Apple provides the in-app purchase system and other platform tools to all licensed iOS developers. ER-157-58 (¶ 87); *see also* ER-119-20.

"Prior to being published in the Apple App Store, developers must submit their app for review." ER-157 (¶ 82). "In this process, Apple examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available." ER-157 (¶ 82 & n.16). Apple's App Store Review Guidelines remind developers that "[g]aming, gambling, and lotteries can be tricky to manage and tend to be one of the most regulated offerings on the App Store. Only include this functionality if you've fully vetted your legal obligations everywhere you make your app available." ER-157 (¶ 83 & n.17 (quoting Guideline 5.3)). That Guideline further provides that "[a]pps may not use in-app purchase [*i.e.*, Apple's commerce engine] to purchase credit or currency for use in conjunction with real money gaming of any kind." ER-133.

Another tool the platform provides to developers is the ability to access data about app users. The App Store Review Guidelines provide that developers "should only request access to data relevant to the core functionality

---

*Apple Inc.*, 559 F. Supp. 3d 898, 1047 n.620 (N.D. Cal. Sept. 10, 2021), *aff'd in relevant part*, 67 F.4th 946 (9th Cir. 2023).

of the app and should only collect and use data that is required to accomplish the relevant task." ER-130. Apple requires "[a]pps that collect user or usage data [to] secure user consent for the collection." ER-129.

### C. Plaintiffs spent money playing games on third-party apps

Plaintiffs are 28 individuals who allegedly spent money playing games on what they call "social casino" apps created by third-party developers and allegedly available on the App Store. ER-144; ER-148-50; ER-161-69 (¶¶ 1-2, 22-49, 109-38). Within such an app, a user can allegedly choose different games—such as bingo, card games, and slot machines—with some apps offering hundreds of different titles. ER-151 (¶ 56). The allegations in the Complaint are limited to the slot-machine style games inside those apps. *See id.*

Virtual slots differ from real slot machines in a fundamental way: players can't win any money. ER-144; ER-152 (¶¶ 3, 65). The only thing players can win is more in-app currency that cannot be used outside the app. Specifically, a player uses virtual currency ("chips") to enable "spins." ER-151 (¶ 59). The apps are generally free to download (ER-144 (¶ 2)), and consumers are "typically given an initial allotment of virtual chips for free" (ER-151 (¶ 60)). Players can thereafter obtain additional chips simply by "wait[ing] for some period of time before receiving more free chips" from the developer. ER-152 (¶ 62).

Developers also sell virtual chips. ER-144 (¶¶ 2, n.2, 3). The Complaint alleges that players purchase that virtual currency using Apple's in-app purchase mechanism, which is available to all developers for transactions in in-app digital content. ER-152 (¶ 63). Purchased chips "extend game-play" in the apps. ER-152 (¶ 64). Consumers can use virtual chips to play any of the games within the app (or can "gift" them to other accounts within that app). ER-152 (¶ 65). A player who "wins" acquires more virtual chips. ER-151 (¶ 60).

Critically, users cannot cash out. "Virtual chips cannot be used outside of any individual Illegal Slots app." ER-152 (¶ 65). No matter how many "chips" a person has, he or she cannot use those chips in another app or redeem them for real money. *Id.*

Plaintiffs allegedly played these games by using real money to buy virtual chips. ER-148-50; ER-161-69 (¶¶ 22-49, 109-38). For example, Plaintiff Cheree Bibbs allegedly "plays and has paid money to DoubleDown Casino, Jackpot Party, and Slotomania through the Apple App Store." ER-162 (¶ 113). The alleged connection between Plaintiffs and Apple is that the apps are available through the App Store and that in-app purchases of digital currency use Apple's commerce engine.

### D. Plaintiffs sue Apple to recover the money they spent

Plaintiffs sued Apple, seeking to recover the money they spent playing the third-party games. They also brought parallel complaints against Google and Meta, with some unique allegations as to each defendant. *See In re Google Play Store Simulated Casino-Style Games Litig.*, No. 21-md-03001 (N.D. Cal.); *In re: Facebook Simulated Casino-Style Games Litig.*, No. 21-cv-02777 (N.D. Cal.). The district court coordinated the three suits. ER-235-40.

Plaintiffs seek to represent 16 statewide classes of all purchasers in those States who spent money playing virtual slots "through the Apple platform." ER-169 (¶ 139); *see* ER-174-223 (¶¶ 148-521).[3] The Complaint alleges that these apps "are illegal under many states' gambling laws." ER-147 (¶ 12). The Complaint invokes *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785-787 (9th Cir. 2018), a case brought against an app developer, which held that using virtual chips to buy spins of the virtual slots on the "Big Fish Casino" app could potentially constitute illegal gambling under Washington state law, when the plaintiff alleged that the only way to acquire more chips was to buy them. *See* ER-147 (¶ 13). Plaintiffs assert that exchanging virtual chips for virtual spins within the virtual slot-machine

---

[3] The States are Alabama, California, Connecticut, Georgia, Illinois, Indiana, Minnesota, Mississippi, Missouri, New Mexico, New York, Ohio, Oregon, South Carolina, Tennessee, and Washington. ER-169-71 (¶¶ 139(a) to 139(p)).

games constitutes illegal gambling under the laws of 16 States, even though the Complaint alleges that users can also acquire chips, for free, simply by waiting. ER-147; ER-152 (¶¶ 12, 62).

Plaintiffs sued Apple under "loss recovery" statutes of 15 States, which provide a cause of action for a person who has lost money on illegal gambling to recover from the winner, *e.g.*, Conn. Gen. Stat. Ann. § 52-554, as well as California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*., which Plaintiffs contend provides a similar remedy, ER-176 (¶ 169). Plaintiffs bring unjust enrichment claims premised on the same alleged illegal gambling. *E.g.*, ER-177 (¶ 178). And Plaintiffs seek to bring a nationwide class, claiming that Apple's conduct violated the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. 1961-1968. ER-148; ER-217-23 (¶¶ 16, 17, 489-521).

The Complaint primarily alleges that Apple is liable to repay the money Plaintiffs spent because it "host[ed]" the apps on the App Store. *E.g.*, ER-146; ER-148; ER-160; ER-174; ER-220; ER-221 (¶¶ 8, 15, 16, 103-06, 151, 506, 512(D)). The Complaint alleges that Apple "did not remove social casinos from [its] offerings" but instead "continue[s] to offer" them. ER-159 (¶ 98).

The Complaint includes some allegations that Apple "promotes" and "facilitates" third-party apps, because developers use Apple's platform for

"payment processing" and the App Store has allegedly "provided them valuable data and insight about their players." ER-146 (¶ 8); *see*, *e.g.*, ER-176 (¶ 166) ("hosting and facilitating"); ER-178 (¶ 185) (providing "marketing guidance," providing "technology," and "facilitat[ing] all in-app purchases").

The Complaint does not allege that Apple actually promoted any of the apps at issue, and none of the Plaintiffs contend that any Apple promotion caused them to download, play, or spend money on the games. The Complaint alleges that Apple "selects apps to feature on the App Store" (ER-158 (¶ 88)), again without alleging that Apple featured any of the apps at issue. The Complaint also alleges that Apple "categorizes" these apps into a "social casino app category" that Apple rates "17+, indicating that the games are not appropriate for minors." ER-157 (¶ 85). Plaintiffs do not allege that such categorization is illegal or harmed them in any way.

As to "facilitation," Plaintiffs allege that developers and Apple "monitor the game activity and use the collected data to increase user spending." ER-158 (¶ 91). Developers allegedly use that data to "target and exploit high-spending users, or 'whales.'" ER-159 (¶¶ 92, 94).

Finally, Plaintiffs allege that Apple "operates as the payment processor" for in-app purchases of virtual currency (ER-152 (¶ 63)) and that Apple "take[s] a 30 percent commission" for such transactions (ER-153 (¶ 76)). Plaintiffs allege that Apple "collects the money players spend on virtual

chips, takes a cut for itself, and remits the rest" to the developers, using its standard commission. ER-152 (¶ 63). The Complaint does not allege that Apple processes (or plays any other role in) the allegedly illegal gambling transaction—*i.e.*, the exchange of virtual chips for virtual spins inside a third-party app.

### E. Procedural history

The district court limited initial motions to dismiss to whether Section 230 barred the claims, and thus the parties (and the court) proceeded on the as-yet untested assumption that the slot-style games within the apps could constitute illegal gambling in at least some States. ER-137-40. Apple moved to dismiss the entire Complaint under Section 230. D. Ct. Doc. 92.

Although the district court agreed with many aspects of Apple's submission, it ultimately denied the motion. ER-3. The court explained that there was "no dispute" that the App Store qualified as an "interactive computer service" and that the apps constituted "information provided by another information content provider," namely, the third-party developers. ER-11. Plaintiffs also abandoned their contentions that Apple could be held liable for "hosting" the apps. *See* ER-57. Thus, the only question was whether the remaining allegations sought to "treat [Apple] as the publisher or speaker" of the allegedly illegal third-party content. ER-11.

To analyze whether Plaintiffs' claims would require treating Apple as the publisher or speaker, the district court grouped Plaintiffs' residual contentions into three sets of allegations: (1) Apple's alleged "promotion" of the social casino apps on its App Store; (2) its alleged involvement in the "social casinos' business strategies" by "sharing data with the social casino app developers"; and (3) its alleged processing of transactions for "gambling chips." ER-34-35. The court held that Section 230 foreclosed Plaintiffs' claims against Apple insofar as they were premised on the alleged promotion and data sharing, but not insofar as they were premised on the alleged payment processing.

The district court "easily dismissed" Plaintiffs' claims to the extent they sought to impose liability based on allegations of promotion of third-party apps on the platform. ER-34. The court likewise held that Section 230 foreclosed liability based on Plaintiffs' allegations that Apple facilitated the developers' business models by sharing data with them. The court explained that "the Platforms are … acting in their role as a 'platform'" in providing the data, and "Plaintiffs do not allege that the Platforms contribution of data and advertisements helped create and develop the application itself." ER-36.

As to Plaintiffs' allegations of payment processing, however, the district court concluded that Section 230 did not foreclose liability. The court

stated that "Plaintiffs neither take issue with the Platforms' universal 30% cut, nor the Platforms' virtual currency sale. Plaintiffs only assert that the Platforms['] role as a 'bookie' is illegal." ER-35. The court concluded that Plaintiffs' claims were "grounded in the Platforms' own bad acts"—the "processing of *unlawful* transactions for *unlawful* gambling"—"not in the content of the social casino apps that the Platforms display on their websites." ER-35.

Recognizing that "reasonable minds could differ" and that litigation was potentially "waste[ful]," the district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. 1292(b). ER-38. This Court granted Apple's petition for review and Plaintiffs' cross-petition. ER-245-46.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1096 (9th Cir. 2019). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A motion to dismiss should be granted when "the allegations, taken as true, show the plaintiff is not entitled to relief" because of the applicability of a

defense. *See Jones v. Bock*, 549 U.S. 199, 215 (2007). This Court has repeatedly affirmed the dismissal of cases under Section 230 at the pleading stage. *E.g.*, *Dyroff*, 934 F.3d at 1101.

## SUMMARY OF THE ARGUMENT

I.    Section 230 preempts any claim that would "treat[]" an interactive computer service "as the publisher" of third-party content. 47 U.S.C. 230(c)(1). It is undisputed that the App Store is an interactive computer service and that the apps here are third-party content. ER-11. The only question is whether Plaintiffs' causes of action would treat Apple as the publisher of those third-party apps. All of them do.

A claim "treats [a platform] as the publisher," 47 U.S.C. 230(c)(1), if it seeks to hold the platform liable for "reviewing, editing, [or] deciding whether to publish or to withdraw from publication third-party content," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). A claim also treats a platform as a publisher if the "underlying legal duty" "would necessarily require an internet company to monitor third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). A plaintiff's claims fail if, "at bottom," they "depend[] on a third party's content, without which no liability could have existed." *Lemmon*, 995 F.3d at 1094.

II. Under those precedents, Section 230 forecloses Plaintiffs' Complaint because all of the causes of action treat Apple as the publisher of third-party apps.

At the outset, the bulk of the Complaint is devoted to allegations that Apple is liable for the money Plaintiffs spent because Apple *hosted* the third-party apps on the App Store platform. Plaintiffs have since abandoned any contention that this "hosting" theory survives Section 230, as it obviously does not. Instead, they sought below to recharacterize their theory of liability in an effort to avoid Section 230. But however characterized, Plaintiffs' causes of action all seek to hold Apple liable for failing to take action to block or remove third-party apps from the App Store. Accordingly, Section 230 bars all of the claims.

A. As the district court correctly recognized, Apple cannot be held liable for the money Plaintiffs spent because Apple allegedly "promoted" third-party apps. *E.g.*, ER-146 (¶ 8). The Complaint does not even allege Apple actually promoted the apps at issue, and in any event, none of the causes of action is limited to promoted apps. Rather, each cause of action seeks to hold Apple liable for *every penny* Plaintiffs spent playing games on hosted apps, without regard to whether those apps were promoted, let alone any allegation that their spending was caused by promotion. They thus boil down to hosting claims that Section 230 squarely bars. In any event, as the

18

district court correctly held, the allegations of promotion are "easily dismissed' under *Dyroff*, because the alleged promotion did not materially contribute to any alleged illegality. ER-34. Rather, that would merely involve "display[ing]," "choos[ing]" and "organiz[ing]" third-party content, which Section 230 itself establishes is protected publisher activity. *See* 47 U.S.C. 230(f)(4).

B.   As the district court also correctly recognized, Plaintiffs similarly cannot circumvent Section 230 by contending that Apple facilitated the developers' wrongdoing by allegedly sharing data with developers. Plaintiffs' claims are not limited to any harm allegedly caused by sharing;  instead, they seek to recover *all* the money they spent within certain apps, regardless of whether caused by sharing of any data. Moreover, the only allegations related to data sharing are that the developers used the same neutral and non-tortious tools that are available to all developers with apps on the App Store platform. Providing such neutral and non-tortious tools does not make a platform liable for the underlying content. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014). Rather, the third-party games remain third-party content, and Apple cannot be held liable for hosting them on the App Store platform without blocking or removing them.

C.   Finally, the district court erred in concluding that Apple may be held liable because users purchase virtual chips inside third-party apps using Apple's commerce engine. Section 230 forecloses that iteration of Plaintiffs' claims as squarely as the others because Apple's alleged liability depends on the content of the apps. Liability would not exist if the content of the apps were different. Apple is therefore immune.

1.   Plaintiffs do not contend that it is independently unlawful for Apple to effectuate in-app transactions, including transactions in which consumers pay developers real money for virtual currency. Apple's in-app purchase mechanism is a neutral, non-tortious tool of the kind that this Court has repeatedly held does not make a platform responsible for third-party content. *See, e.g.*, *Perfect 10*, 488 F.3d at 1118.

Plaintiffs assert that the otherwise lawful act of facilitating an in-app transaction becomes unlawful if a consumer purchases virtual currency (or "chips") that a player is "substantially certain" to later use inside an app to pay for "spins" of virtual "slots." ER-64; ER-79. But that is a duty that "depend[s] on [] third party's content, without which no liability could have existed." *Lemmon*, 995 F.3d at 1094. The nature of the app, game, and in-app currency are all third-party content. If the app offered different games, or the currency were used differently, then Apple would face no liability. Apple's liability thus inextricably depends on third-party content.

Indeed, the virtual chips are themselves third-party content. They are purely digital and have no utility outside the third-party apps. They are no more real than the virtual ghosts in a game of Pac-Man. Apple cannot be held liable merely for processing the payment for that in-app content, as other courts have recognized on materially identical facts. *See, e.g.*, *Coffee v. Google LLC*, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022).

2.  To overcome that clear barrier, Plaintiffs have sought to analogize this case to *HomeAway*, in which this Court held that operators of websites for rental properties were not exempt from a city ordinance that prohibited renting certain units. But that case is fundamentally different. The website operators in *HomeAway* had a duty that was independent of hosted content (to refrain from booking certain real-world rental units). They also could comply without monitoring any hosted content: they could simply look at the rental transaction itself to find the location of the listing, and then cross-reference the location to an off-platform city registry.

Unlike in *HomeAway*, the duty that Plaintiffs seek to impose on Apple depends on third-party content. The duty is to forbear from processing an in-app payment *only if the payment is for certain in-app content that is allegedly illegal*: Liability would attach if, but only if, the developer has created a casino-style app that enables users to use virtual "chips" to play virtual spins of virtual slots. If the developer changed the content so that the

games were different or the players could only purchase something else (say, an avatar), there would be no liability. The duty therefore depends on content and thus the claim treats Apple as the publisher.

Moreover, to avoid liability, Apple would need to monitor third-party content and to block or remove content that is potentially objectionable. Because Apple operates a general-purpose app platform, Apple would need to monitor the content of each app, every game offered in any gaming app, and track users' behavior at all times inside the app, to determine what in-app content is offered for that in-app currency. And because the games are allegedly illegal only in some States, Apple would need to monitor *where each user is located at all times* they are using each app. So the duty to monitor would be mandatory and pervasive, giving rise to grave privacy problems.

Even worse, Plaintiffs' theory about processing transactions cannot be limited to gambling. Rather, it would extend to any use of virtual currency, which is commonplace in game apps—and more broadly to any allegedly unlawful digital content that a user has paid for using Apple's in-app purchase mechanism. Monitoring all of that content, at all times, to ensure compliance with every state and local law, would be incredibly burdensome and intrusive—exactly what Section 230 prohibits.

3.     Allowing this case to proceed would flout Congress's stated purposes in enacting Section 230. The Complaint seeks to use Apple's efforts to

protect users from dangerous apps—including Apple's review of apps and its identification of some games (including those at issue) as appropriate only for an adult audience—as a basis for holding Apple liable for failing to block or remove these apps. But a primary purpose of Section 230 is to protect platforms from such a "monitor's dilemma," which can create perverse incentives to be unduly restrictive (making the platform less vibrant) or to weaken or even abandon monitoring efforts (making the platform less safe).

Section 230 gives platforms breathing room to set their own standards for monitoring content, subject only to narrow exceptions for certain content (like child sexual abuse material) that Congress found to be particularly problematic. Congress fostered a vibrant competitive landscape where platforms compete, among other things, on their approaches to monitoring all other digital content, including video games. Plaintiffs' one-size-fits-all approach to monitoring—requiring pervasive monitoring of every user's conduct and location at all times—would subvert those congressional judgments. It would expose app platforms to potentially sweeping litigation risk, for all manner of allegedly illegal in-app content, creating a powerful incentive to undermine the vibrancy of the platform by curtailing the availability of third-party apps.

4.   The district court's decision that Section 230 does not bar Plaintiffs' claims rested on Plaintiffs' *post hoc* argument that Apple is a "bookie"

in the alleged transaction, and the court's corollary conclusion that Plaintiffs seek to hold Apple liable for its "own bad acts." ER-35. But the Complaint does not actually allege that Apple is a "bookie," and the well-pleaded factual allegations establish that Apple is not. The developer creates the games, sets the odds, takes the bets, and rewards the winner (or not) with virtual currency. By contrast, there is no risk, chance, or booking of bets in the transaction Apple facilitates with its commerce engine. Consumers get exactly what they pay for: virtual currency. Apple's role in facilitating that lawful transaction thus cannot be used to bootstrap liability for a distinct in-app transaction that is allegedly illegal but in which Apple plays no role.

## ARGUMENT

### Section 230 forecloses Plaintiffs' claims against Apple because they treat Apple as the publisher of third-party apps on the App Store

Section 230 forecloses all of Plaintiffs' claims against Apple because the Complaint seeks to hold Apple liable for third-party content hosted on the App Store. To avoid dismissal, Plaintiffs attempted to separate their allegations into three categories—"promotion," "data sharing," and "payment processing"—hoping one would stick. But each is an impermissible attempt to circumvent Section 230. At its core, each set of allegations still treats Apple as the publisher of third-party content on the App Store platform. The district court correctly recognized that the first two—promotion and data sharing—are foreclosed under Section 230, but erred in failing to recognize

that the third is too. When properly analyzed under the statutory text and this Court's precedents, every cause of action against Apple must be dismissed.

## I. Section 230 prevents platforms from being held liable for third-party content

This Court applies a three-part test for determining whether Section 230 immunity applies. *See Barnes*, 570 F.3d at 1100-01. *First*, the defendant must use or operate "an interactive computer service." *Id. Second*, the claim must "treat[]" the defendant "as the publisher or speaker" of the content. *Id.* A claim treats a defendant as the publisher if it would force the platform "to remove any user content or otherwise affect how it publishes or monitors such content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). If a plaintiff's claim "depend[s] on a third party's content, without which no liability could have existed," then the claim treats the platform as the publisher of that content. *Lemmon*, 995 F.3d at 1094 (citing *Dyroff*, 934 F.3d at 1096)). *Third*, that content must be "creat[ed]" or "develop[ed]" by "another information content provider." *Barnes*, 570 F.3d at 1101 & n.6. An "information content provider" is an entity "that is responsible, in whole or in part, for the creation or development of information." 47 U.S.C. 230(f)(3). And an entity "creat[es] or develop[s]" content "by making a material contribution to [its] creation or development." *Kimzey*, 836 F.3d at 1269; *see Roommates*, 521 F.3d at 1167-68.

"There is no dispute that prongs one and three" of the *Barnes* test "are satisfied." ER-11. Courts have consistently held that the App Store is an "interactive computer service." *E.g.*, *Free Kick Master LLC v. Apple Inc.*, 140 F. Supp. 3d 975, 980-81, 983 (N.D. Cal. 2015). And the Complaint alleges that third-party developers ("social casino companies") created the apps. *E.g.*, ER-144 (¶ 2). Moreover, although Congress has enacted several exceptions to Section 230(c)(1), including for federal criminal prosecutions and for conduct involving certain child sexual abuse materials, *see* 47 U.S.C. 230(e)(1) and (5), no exceptions exists for state anti-gambling laws.

Therefore, the only question before this Court is whether Plaintiffs' claims would treat Apple as the publisher of the third-party apps on the App Store platform that allegedly include illegal content.

This Court has found that a claim treats a platform as a publisher if the alleged liability "derives from [the platform's] status or conduct as a 'publisher or speaker.'" *Barnes*, 570 F.3d at 1102. That includes any claims arising from traditional publishing functions, such as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates*, 521 F.3d at 1170-71.

Another way this Court determines whether a plaintiff's claim treats a platform as the publisher is to look to what the "underlying legal duty" at issue "actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content." *HomeAway*, 918 F.3d at 682. Imposing such a duty to monitor effectively holds the platform liable for failing to block or remove content, and thus would treat the platform as the publisher. *See id.*

This Court has held that a plaintiff cannot "plead around Section 230" by pointing to neutral and non-tortious "features and functions" of a platform "meant to facilitate the communication and content of others." *Dyroff*, 934 F.3d at 1098. For example, a platform does not become liable for allegedly tortious third-party content by "allow[ing] consumers to use credit cards or checks to pay for subscriptions" to access that content. *Perfect 10*, 488 F.3d. at 1108, 1119. Similarly, a platform does not become liable for third-party content by using algorithmic recommendations, *see Dyroff*, 934 F.3d at 1098, or data collection, "to direct users to" that content, *see Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020). The use of such neutral and non-tortious tools for facilitating third-party communications does not make the platform responsible for the content itself. *See Dyroff*, 934 F.3d at 1097. It remains third-party content,

for which the platform is immune. And neutral non-tortious tools are themselves, by definition, not tortious.

Conversely, Section 230 does not apply when liability arises from the platform's "own conduct" that is *itself* tortious, independent of underlying third-party content. *Dyroff*, 934 F.3d at 1099. For example, in *Lemmon*, parents of deceased teenagers brought claims against Snap, Inc., alleging that "negligent design" of its own app—Snap's "speed filter" that enabled users to record their real-life speed—caused their sons' deaths by inducing them to "drive at dangerous speeds." 995 F.3d at 1087-88. This Court held that the plaintiffs' claims did not treat Snap as the publisher or speaker of third-party content, because the app's design (Snap's filter) was itself allegedly tortious. *Id.* at 1092. That duty "ha[d] nothing to do with," and was "fully independent of," the platform's role in "editing, monitoring, or removing" user-generated content. *Id.* at 1092-93; *see also*, *e.g.*, *Roommates*, 521 F.3d at 1166 (holding that Section 230 did not immunize a platform for designing an interface that prompted users to engage in housing discrimination).

This Court rejects "creative pleading" that attempts to "circumvent [Section 230's] protections." *Kimzey*, 836 F.3d at 1265-66. Where, after distilling the claims, plaintiffs "advance the same basic argument that the statute plainly bars: that [the defendant] published user-generated speech that was harmful to [the plaintiffs]," the claim is foreclosed. *Id.* "[T]here will

always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality." *Roommates*, 521 F.3d at 1174 (emphasis in original). Such efforts fail where "the plaintiff's claims, at bottom, depend[] on a third party's content, without which no liability could have existed." *Lemmon*, 995 F.3d at 1094; *see also Barnes*, 570 F.3d at 1102.

## II. Plaintiffs' claims against Apple fail because they would hold Apple liable for third-party content on the App Store

Section 230 forecloses all of Plaintiffs' claims against Apple because they seek to treat Apple as the publisher of third-party apps. The bulk of the Complaint alleges that the apps include games that amount to illegal gambling in 16 States, and that Apple is liable for the "losses" Plaintiffs allegedly incurred (that is, the real money they spent on virtual chips they used to play these games) because those games are hosted on the App Store. *See* ER-160-61 (¶¶ 103-08) ("Players Are Harmed By the Illegal Slots Hosted by Defendant."). The Complaint repeatedly alleges that Apple "host[s]," "distribut[es]," and "operat[es]" the third-party apps. *E.g.*, ER-146; ER-148 (¶¶ 8, 16, 18). It also alleges that Apple "did not remove social casinos from [its] offerings" but instead "continue[s] to offer" them. ER-159 (¶ 98).

Because the only substantive issue decided in this litigation has been the applicability of Section 230, Plaintiffs' contention that simulated slot

games are illegal has never been tested or resolved.[4] But even if Plaintiffs' allegations of unlawful activity were well-founded, those allegations fall into the heartland of Section 230 and Plaintiffs' claims against Apple are therefore precluded. They treat Apple as a publisher of third-party content by seeking to hold Apple liable for failing to block or remove that content from its platform.

Indeed, in response to Apple's motion to dismiss, Plaintiffs abandoned their claims for "hosting" the apps. *See* ER-57 ("[Plaintiffs] do not seek to hold the Platforms liable for … hosting social casino apps."). Plaintiffs thus filed a Complaint based on "hosting," but dropped the centerpiece of that Complaint because Section 230 plainly forecloses it.

Plaintiffs are now seeking to use "creative pleading" (or, even more impermissibly, lawyer arguments that go beyond the allegations in the Complaint) to rewrite their complaint and "circumvent" Section 230. *Kimzey*, 836 F.3d at 1265-66. Yet Plaintiffs' allegations of conduct by Apple—of "promotion," "data sharing," and "payment processing"—would still treat Apple as the publisher of the third-party games, because none of that conduct is

---

[4] Moreover, even if the games could be considered illegal, Apple could not be held secondarily liable for them. *See Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1227 (2023); *see also* n.10, *infra*. In the unlikely event that Section 230 does not foreclose all of Plaintiffs' claims, unresolved issues of primary and secondary liability would provide independent bases for dismissal on the pleadings.

independently tortious. Each step of the way, Apple's alleged liability depends on the content of third-party apps.

Plaintiffs' briefing below made this point clear. They recognized that Apple's "various payment-processing, app-promotion, data-collection, user-targeting, [or] marketing tools" are not independently tortious. ER-79. Rather, they argued that those tools "become unlawful *when used to book illegal gambling transactions and to unfairly target vulnerable consumers.*" *Id.* (emphasis added). As the phrase "become[s] unlawful" indicates, Plaintiffs' entire Complaint "depend[s] on a third party's content, without which no liability could have existed." *Lemmon*, 995 F.3d at 1094 (citing *Dyroff*, 934 F.3d at 1096)). It is the third-party developer (not Apple) that allegedly "used" the platform to "book[] illegal gambling transactions" and "unfairly target[] vulnerable consumers." ER-79. Plaintiffs' claims of liability thus all boil down to a contention that developers created illegal content that is available on the App Store without having been blocked or removed. Apple is thus "perforce immune." *Roommates*, 521 F.3d at 1170-71.

### A. Plaintiffs cannot circumvent Section 230 by alleging that Apple promoted third-party apps on the App Store

Plaintiffs first attempt to plead around Section 230 by making a conclusory allegation that Apple "promot[ed]" the third-party apps. *See, e.g.*, ER-148 (¶ 16) (alleging that Apple "illegally … promote[s]" the apps). Be-

yond alleging that Apple "categorizes" these apps and "selects apps to feature on the App Store" (ER-157; ER-158 (¶¶ 84, 88))—paradigmatic "publisher" activities—Plaintiffs' Complaint against Apple contains no specific allegations of "promotion." Plaintiffs may not rely on allegations it has asserted against the other platforms to salvage its claims *as to Apple*. The district court correctly dismissed the "promotion" theory (ER-34), which fails for at least three reasons.

*First*, although the Complaint alleges that Apple selects apps to "feature" (ER-158 (¶ 88)), the Complaint fails to allege that Apple actually featured any of the apps at issue. *Compare* (ER-158 (¶ 88)), *with* Master Class Action at ¶ 80, *In re: Facebook Simulated Casino-Style Games Litig.*, No. 21-cv-02777 (N.D. Cal. Nov. 22, 2021), ECF No. 80 ("Facebook sends targeted ads offering in-game rewards to users who invite their Facebook friends to also play the Illegal Slots."). And the allegation that Apple categorizes these apps together (and indicated that they were "not appropriate for minors") (ER-157 (¶ 85)), does not plausibly suggest that Apple "promoted" them. *Compare* (ER-157 (¶ 85)), *with* Master Class Action Compl. at ¶ 86, *In re Google Play Store Simulated Casino-Style Games Litig.*, No. 21-md-03001 (N.D. Cal. Nov. 22, 2021), ECF No. 52 ("Google [] runs promotional activities (such as offering coupons, credits, and/or other promo-

tional incentives) for in-app transactions through Google Play."). If anything, it suggests that Apple discouraged certain users from downloading those apps. The Complaint thus does not plausibly suggest that Apple "promoted" these apps.

*Second*, the Complaint lacks allegations to establish the necessary causal link between any "promotion," "featuring," or "categorization" and Plaintiffs' causes of action, alleged losses, or requested relief. The Complaint includes 29 paragraphs devoted to the Plaintiffs. ER-161-69 (¶¶ 109-38). But none allege that *any* Plaintiff viewed any promotion, featuring, or categorization by Apple, and much less that Apple's featuring or categorizing these apps caused them to download the app, play virtual slots (rather than other games), buy virtual chips (rather than waiting and acquiring them for free), and then use them on spins while located in one of the 16 States in which that is allegedly illegal (rather than in one of the 34 States in which it is undisputed they are lawful). Rather, those paragraphs allege that each Plaintiff spent money to play third-party games "through the Apple App Store." *Id.* The causes of action thus are for hosting the apps, not for promoting them.

The class allegations and demand for relief reinforce the point. Plaintiffs seek to represent all users in 16 States who "lost money to any Illegal Slots through the Apple platform," without limitation to losses caused by

any alleged promotion. ER-169-71 (¶¶ 139(a) to 139(q)). As a remedy, Plaintiffs seek to recover the full amount of real money they allegedly spent playing these games, not merely spending caused by alleged promotion. ER-223 (¶¶ (d), (e)). Plaintiffs' conclusory allegations of "promotion" thus are a fig leaf. Plaintiffs actually seek to hold Apple liable for the alleged harm arising from hosting third-party content, so Section 230 forecloses the claims.

*Third,* as the district court correctly determined (ER-34), any allegations of promotion are materially identical to allegations this Court rejected in *Dyroff.* In that case, the defendant ran an online messaging board. 934 F.3d at 1094. One user posted about buying heroin and another responded. *Id.* at 1095. The two met up, and the user died because the heroin he purchased was laced with fentanyl. *Id.* The user's mother sued the platform, alleging that it was liable because it "used features and functions, including algorithms, to analyze user posts ... and recommended other user groups." *Id.* at 1098. This Court concluded that Section 230 applied because "recommending user groups and sending email notifications … was acting as a publisher of others' content." *Id.*

The Court explained in *Dyroff* that the plaintiff could not "plead around Section 230" by pointing to the platform's "features and functions," because those features—"recommendations and notifications"—were neutral, non-tortious "tools meant to facilitate the communication and content

of others." *Id.* Those features did not materially contribute to the illegal content; they "amounted to content-neutral functions that did not create a risk of harm." *Id.* at 1100; *see also Kimzey*, 836 F.3d at 1270 (A platform "does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online.").[5]

Section 230 similarly bars liability grounded in the allegations of "promotion" here. "Featuring" or "categorizing" apps on the App Store does not "materially contribut[e]" to their illegality. *Roommates,* 521 F.3d at 1167-68. The apps remain unchanged. Rather, featuring or categorizing third-party content merely "facilitate[s] the communication and content of others." *Dyroff*, 934 F.3d at 1098.

Indeed, "featuring" and "categorizing" is critical to publishing third-party content on a platform, because any provider that hosts content must

---

[5] The district court also relied on *Gonzalez v. Google LLC*, which followed *Dyroff* to hold that a platform does not become responsible for third-party content by making recommendations generated by neutral algorithms. 2 F.4th 871, 893 (9th Cir. 2021). The Supreme Court granted certiorari and vacated *Gonzalez* on other grounds. 143 S. Ct. 1191, 1192 (2023). This Court's prior opinion is no longer binding. *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2001). But that does not alter the analysis of the promotion point because *Dyroff* already established that such promotion does not make a platform liable for third-party content.

display and order it so users can find it. For example, the editors of a newspaper must decide which articles to put on which page, in which sections of the paper, and in what priority. *See, e.g.*, Suzanne Daley, Making the Front Page: How All the News Fits in Print, N.Y. Times (Dec. 23, 2019).[6] Whether described as "promoting," "featuring," or "categorizing" the content, those are aspects of the editorial function. And it is well-settled that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions … are barred." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

The broader statutory context confirms the point. Congress defined "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. 230(f)(2). And Congress defined "access software provider" to mean the provider of "tools" that, among other things, "filter, screen," "pick, choose," "display," "subset," "organize [or] reorganize" content. 47 U.S.C. 230(f)(4).

"Featuring" or "categorizing" third-party apps involves "filter[ing]," "pick[ing]," "choos[ing]," "display[ing]," "organiz[ing]," "reorganiz[ing]," and

---

[6] https://www.nytimes.com/2019/12/23/reader-center/front-page-headlines.html.

"subset[ting]" that content. Those acts qualify a service as providing an "interactive computer service." Those same acts are not fairly understood to simultaneously eliminate the very statutory protection that has just been granted. "Congress does not … take away with one hand what [it] has given … with the other." *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 57 (2013). The Complaint's allegations of "promotion" thus would treat Apple as the publisher of third-party content, and therefore are foreclosed.

## B. Plaintiffs cannot circumvent Section 230 by alleging that Apple shared data with developers of third-party apps

The district court also correctly held (ER-36) that Plaintiffs cannot plead around Section 230 by alleging that Apple is involved in the developers' business strategies by providing developers "valuable data and insight about their players," which allegedly enables developers to target so-called "whales" (ER-146; ER-153; ER-158-59 (¶¶ 8, 73, 91)).

As the district court explained, the Complaint does not allege that Apple's neutral and generally-available tools through which developers may obtain user data are themselves tortious. ER-36. Rather, Plaintiffs' (unpleaded) theory is that those tools "become unlawful *when used* … to unfairly target vulnerable consumers." ER-79 (emphasis added). But it is third-party developers that "use[]" those tools to target particular consumers. And Apple could not determine whether its otherwise lawful tools have

"become unlawful" without monitoring how developers have used them, including what developers are doing to "target and exploit high-spending users, or 'whales.'" ER-159 (¶ 92). That theory thus "would necessarily require [Apple] to monitor third-party content," and thus to block or remove potentially objectionable content. *HomeAway*, 918 F.3d at 682; *see also* pp.49-52, *infra*. Accordingly, Section 230 bars that theory of liability as well.

Other courts have barred analogous efforts to circumvent Section 230. For example, in *Klayman v. Zuckerberg*, 753 F.3d 1354, 1355 (D.C. Cir. 2014), the D.C. Circuit held that Facebook did not become potentially liable for an allegedly tortious third-party Facebook page by "collect[ing] data on its users and their activities, which it employ[ed] to make its advertising more profitable." *Id.* at 1358. "Even if true," the court explained, those allegations were "irrelevant" to the plaintiffs' "theories of liability" because "Facebook could only collect such data … after some third party had created the pages and their content." *Id.* Likewise, in *Federal Agency of News LLC v. Facebook, Inc.*, a district court confronted claims that Facebook "utilize[d] 'data mining' 'to direct users to content in order to generate billions in revenue.'" 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020). The court held that "data mining" is a "tool[] meant to facilitate the communication and content of others," "not content in and of" itself. *Id.* (citation omitted); *see also A.B. v. Facebook, Inc.*, 2021 WL 2791618, at *3 (C.D. Cal. June 1, 2021) (similar).

38

The data-sharing allegations here are even more clearly insufficient. As in *Klayman*, Plaintiffs' allegations regarding Apple's data sharing are "irrelevant" to their causes of action. 753 F.3d at 1358. Plaintiffs seek to hold Apple liable for all the money they spent playing these games, not just sales that were somehow caused by the alleged data sharing. *See* p.33, *supra*. Plaintiffs also do not allege that the data "helped create and develop the application itself." ER-36. Rather, Apple "could only collect such data … after some third party had created the [apps] and their content." *Klayman*, 753 F.3d at 1358. And whereas in *Federal Agency* the platform allegedly used the data for its own promotion, the Complaint alleges that *developers* used the data for their promotion. Third-party promotion is third-party content and Apple is not liable for it.

Section 230 thus forecloses Plaintiffs' data-sharing theory because, at bottom, it seeks to hold Apple liable for third-party content.

### C. Plaintiffs cannot circumvent Section 230 by alleging that Apple processed transactions for virtual currency sold by developers within third-party apps

Finally, Plaintiffs cannot plead around Section 230 and hold Apple liable for the money they spent playing these games by alleging that they used Apple's in-app purchase mechanism to buy virtual "chips" from developers within the third-party apps. ER-152; ER-155 (¶¶ 63, 76). In fact, the district court should not even have treated the payment-processing theory

as a stand-alone basis for liability. *See* Google's Principal Br. at 21-25. None of Plaintiffs' causes of action is predicated on payment processing standing alone; they all depend on hosting as well. *E.g.*, ER-174 (¶ 151) ("hosting and facilitating"); ER-178; ER-182 (¶¶ 185, 212) ("offers and distributes" apps "and facilitates all in-app purchases"). Regardless, because the apps are content, the games are content, and the virtual chips are themselves in-app content, the alleged illegality "depend[s] on a third party's content, without which no liability could have existed." *Lemmon*, 995 F.3d at 1094. The district court thus erred in declining to dismiss the entire Complaint.

### 1. Plaintiffs' payment-processing claims depend on third-party content

a. At the outset, it is undisputed that Apple's in-app purchase mechanism is not independently tortious. Plaintiffs admit that it is lawful for Apple to effectuate transactions in virtual currency and to charge a commission: "Plaintiffs neither take issue with the Platforms' universal 30% cut, nor the Platforms' virtual currency sale." ER-35. Apple's in-app purchase mechanism is thus the kind of neutral, non-tortious tool that does not make a platform responsible for third-party content. *See, e.g.*, *Dyroff*, 934 F.3d at 1098; *Perfect 10*, 488 F.3d at 1118.

In opposing Apple's motion to dismiss, Plaintiffs instead asserted that Apple's in-app purchase mechanism "become[s] unlawful when used to

book illegal gambling transactions." ER-79. But developers (not Apple) allegedly "book [the] illegal gambling transactions" within third-party apps. Accordingly, Apple's alleged liability depends on third-party content: the contents of the developer's app. So that theory treats Apple as the publisher as well, and Section 230 therefore bars it.

The Complaint describes two distinct transactions—but Apple is allegedly involved only in one of them. First, within an app, users "navigate to an electronic store" and "purchase chip packages" from the developer using real money. ER-152 (¶ 62). The Complaint alleges that "Apple operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots" ER-152 (¶ 63), and takes its standard commission. Second, the Complaint alleges that, after acquiring virtual chips (through Apple's commerce engine or simply by waiting and obtaining them from the developer for free), consumers can use them within the app to exchange virtual chips for virtual spins. ER-152 (¶ 65).

Only the second transaction is allegedly illegal: The Complaint alleges that it constitutes unlawful "gambling" in 16 States to exchange virtual chips for virtual spins of virtual slots. *See, e.g.*, ER-147; ER-155 (¶¶ 12, 78). The Complaint invokes statutes that Plaintiffs allege provide a cause of action to recover gambling "losses" from the "winner," *see*, *e.g.*, Conn. Gen. Stat. Ann. § 52-554, as well as unjust enrichment counts and a RICO claim

41

predicated on the same allegedly illegal gambling (ER-216-23 (¶¶ 482-521)).

But the Complaint does not allege that Apple participates in that second transaction. Apple does not create the apps or the games within them, book bets, determine odds, convert chips into bets, pay "winners," or partake in any such activities that are allegedly illegal. The alleged gambling transaction occurs between the user and the developer "[w]ithin the Illegal Slots," *i.e.*, as content within the third-party app. ER-151 (Compl ¶ 60). For example, the Complaint alleges players "place wagers (using virtual chips)" inside an app, "press a button to 'spin' the slot" inside the app, and that "[t]here is no skill involved in the slot machine games offered at the Illegal Slots," that is, inside the app. ER-151 (¶ 59). And it alleges that "[d]evelopers," not Apple, "code[] into the … apps … the payout for each possible game event," that is, "they determine how many chips players receive for various spin outcomes." ER-153 (¶ 68).

Apple's alleged role is limited to processing only the first transaction, in which a user purchases virtual currency from the developer. There is no element of chance: Users get exactly what they pay for, namely, a stated number of virtual chips for a listed price. Moreover, Apple does not even sell the chips. Developers "sell 'in-game' items." ER-144 (¶ 2, n.2); *see also* ER-145 (¶ 3, fig. 2) (illustrating an in-app interface for purchasing virtual chips

from a developer). The license agreement provides that developers "are responsible for hosting and delivering content … sold by [the developer] using the In-App Purchase API." ER-86. And the developer, not Apple, determines what a user can do inside an app with any in-app content, including virtual currency.

Indeed, the virtual currency is itself in-app content. Plaintiffs allege that they purchased "*virtual* coins or tokens" that "*cannot be used outside of any individual Illegal Slots app*" and cannot be exchanged or redeemed for real money. ER-152 (¶ 65) (emphasis added). The chips themselves are thus "information provided by another information content provider." 47 U.S.C. 230(c)(1). And they can only be used to "obtain additional entertainment and extend gameplay." ER-179-80 (¶ 195).[7] The developer provides the chips (content) solely within an app, indicating how many "spins" a user can play of a game (content) in an app (content). ER-152 (¶ 65). They are no more real than the ghosts in a game of Pac-Man, the weapons in a game of Call of Duty, or the coins in a game of Mario Brothers.

---

[7] Apple does not allow use of its in-app purchase mechanism for purchase of "goods or services that will be consumed outside the app." ER-121 (§ 3.1.3(e)); *compare* ER-119 (§ 3.1.1 (developers must use in-app purchase to "unlock features or functionality within [their] app")).

Plaintiffs' claims against Apple thus inextricably depend on third-party content: the asserted duty to forbear from processing transactions depends on the content of the app, the games within it, and the developer's choices about how in-app currency can be used.

A recent district court decision dismissing similar claims under Section 230 is instructive. *Coffee v. Google*, No. 20-cv-3901-BLF, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022). There, plaintiffs sought to hold Google liable for apps on its Play Store—an analogue to Apple's App Store—in which users could purchase virtual currency to later use within the app to purchase "Loot Boxes." *Id.* at *1-2. A loot box "offers the player a randomized chance to receive an item designed to enhance the gaming experience, such as a better weapon, faster car," and "[t]he player does not know what specific item any given Loot Box contains at the time of purchase." *Id.* at *1. The plaintiffs alleged that Google processed the payment for virtual currency, and that Loot Boxes are illegal gambling devices. But the plaintiffs did not allege that Google had "any involvement in the second part of th[e] two-step transaction, the purchase of the Loot Box with virtual currency." *Id.* at *2.

The district court in *Coffee* concluded that Section 230 barred the claims because Google's "conduct in processing sales of virtual currency" was "not alleged to be illegal." *Id.* at *6. To the contrary, the complaint alleged that "[v]irtual currency is a type of unregulated digital currency that

is only available in electronic form." *Id.* Moreover, Google did not even sell the Loot Boxes. Accordingly, even if selling them were illegal, "such illegality is committed by the developer who sells the Loot Box for virtual currency, not by Google." *Id.* Accordingly, the plaintiffs' efforts to impose liability on Google for "process[ing] *lawful* transactions for virtual currency where such currency could be used to buy Loot Boxes in third-party apps downloaded from the Play Store" were "grounded entirely in the content" of the third-party apps. *Id.* Section 230 therefore foreclosed the claims.[8]

Courts have relied on the distinction between processing payments for virtual chips and a player's later use of those chips for alleged gambling to reject similar claims against payment processors—even without regard to Section 230 and when the gambling payouts were real money. *See, e.g.*, *In re Mastercard Int'l, Inc., Internet Gambling Litig.*, 313 F.3d 257 (5th Cir.

---

[8] The district court in *Coffee* distinguished an unpublished order entered in *Taylor v. Apple, Inc.*, No. 20-cv-03906-RS, 2021 WL 11559513 (N.D. Cal. Mar. 19, 2021), in which the plaintiffs alleged that Apple itself sold the allegedly illegal gaming devices. *Id.* at *4. As in *Coffee*, there is no such allegation here. The *Taylor* court ultimately dismissed the claims on the merits, holding that the users got "exactly what [they] paid for—virtual currency." 2022 WL 35601, at *2 (N.D. Cal. Jan. 4, 2022). In any event, Section 230 is properly understood to foreclose the claims in *Taylor*, because the duty alleged depends on "third-party[] content, without which no liability could have existed," *Lemmon*, 995 F.3d at 1094, namely, the loot box that is itself in-app content.

2002); *Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915 (2010). For example, in *Mastercard*, the plaintiffs sued credit card companies, seeking to hold them liable for "debts they incurred when they used their credit cards to purchase 'chips'" for use in online casinos that provided real payouts and were allegedly illegal. 313 F.3d at 259. The district court rejected the effort and the Fifth Circuit affirmed, explaining that "the Defendants completed their transaction [for virtual chips] with the Plaintiffs *before* any gambling occurred," as the alleged gambling occurred later, in a distinct transaction solely between the player and the casino. *Id.* at 262. The Fifth Circuit emphasized that the plaintiffs "are not victims under the facts of these cases." *Id.* at 264. "In engaging in this conduct, they got exactly what they bargained for—gambling 'chips' with which they could place wagers." *Id.* So too here.

As in those cases, Apple does not create the apps, the virtual currency, or the games. Nor does it set the odds, book any bets, or provide any payouts. Nor do Plaintiffs allege that Apple even sells the virtual currency. ER-144 (¶ 2, n.2). The developer does all of that. Apple merely provides neutral and non-tortious tools for all developers to conduct in-app transactions with consumers, including for virtual currency—transactions in which users get exactly what they pay for. And what they are paying for is itself in-

app content (virtual chips) to be used to enhance in-app content ("extend[ing] gameplay" by enabling consumers to play more "spins"). ER-152 (¶ 64). The duty Plaintiffs would impose thus depends on third-party content: Apple would not be liable if the apps included different content allowing different uses of in-app currency. As in *Coffee*, Plaintiffs cannot rely on Apple's in-app purchase mechanism to circumvent Section 230.

b.    Plaintiffs attempt to bridge the gap between Apple's processing of the (lawful) virtual currency transaction and the allegedly illegal transaction inside the app by alleging that "[s]ubstantially all virtual chips are used on slot machine spins." ER-152 (¶ 65). But that merely reinforces that the duty Plaintiffs assert "depend[s] on a third party's content." *Lemmon*, 995 F.3d at 1094. Whether "substantially all" chips are used to buy virtual spins (as distinguished from, say, an avatar) depends on third-party content, and in particular the developer's choices in designing the game (and how users react inside the app). And as set forth above, the chips are themselves in-app content. So Plaintiffs' claims against Apple inevitably seek to hold Apple liable for third-party content.

### 2. *HomeAway* is inapposite and indeed supports Apple

Plaintiffs have primarily relied on this Court's decision in *HomeAway*. *E.g.*, ER-51; ER-52; ER-57; ER-60. But that decision is inapposite and, indeed, confirms that Section 230 applies here.

47

As set forth above, a claim treats a platform as a publisher if the duty (1) depends on hosted content or (2) would necessarily require the platform to monitor hosted content. *See* p.25, *supra*. In *HomeAway*, the duty did neither. In that case, developers of short-term rental websites contended that Section 230 exempted them from a city ordinance that prohibited booking short-term rentals that were not "licensed and listed on the City's registry." 918 F.3d at 680. The developers did not argue that the duty depended on content. The duty was to "refrain[] from completing any booking transaction" for unlisted properties. *Id.* Booking a rental is conduct, and that was the rental websites' core business. *See id.* at 679.

The rental websites in *HomeAway* instead argued that Section 230 exempted them because the ordinance required them to "monitor the content of a third-party listing and compare it against the City's short-term rental registry." *Id.* at 682. This Court disagreed. It explained that the duty did not "necessarily require" the rental websites "to monitor third-party content." *Id.* They needed only to monitor "incoming requests to complete a booking transaction"—that is, to review their own transactions that were "distinct, internal, and nonpublic"—to determine the address of the unit they were booking, and then cross-reference that address against the City's (off-platform) registry. *Id.* Indeed, the website would have remained liable

even if the address posted online were changed (or removed), yet the website still booked an unregistered rental. The duty thus depended on the website's own conduct, not hosted content, so there was no need to monitor hosted content.

By contrast, Plaintiffs' claims against Apple depend on hosted content and compliance would require monitoring hosted content. *HomeAway* is thus inapposite.

*First,* Apple's alleged duty depends on in-app content. It is undisputed that processing an in-app purchase is not itself unlawful. The duty alleged is instead to refrain from facilitating in-app purchases *only for certain content*, namely, in-app currency in the form of "chips" that are substantially likely later to be used to play virtual slots that allegedly qualify as gambling in some States. *See* ER-152 (¶ 65). But unlike a brick-and-mortar rental unit, in-app currency is itself hosted "information provided by another information content provider." 47 U.S.C. 230(c)(1). The second transaction thus consists entirely of hosted content: The alleged gambling consists of a user of an app (content) playing a game (content) using in-app currency (content). Indeed, the in-app currency "cannot be used outside of any individual Illegal Slots app." ER-152 (¶ 65). It can only be used to "extend gameplay" (content) by enabling consumers to play more "spins" (also content). ER-152 (¶ 64); *see* p.43, *supra.* The duty Plaintiffs are seeking to impose

49

therefore depends on content stacked on top of content on top of content. It is turtles all the way down.

Conversely, if the third-party app had different content, Apple would not be liable. For example, if a user purchased virtual chips on one of these apps but the developer changed the app such that the games no longer involved betting, or the player could only use the chips in a different way (say, to purchase an avatar), then no alleged gambling would occur and there would be no illegality. The hosted content itself—and whether a third-party has created allegedly illegal content—is thus a necessary element of Plaintiffs' claim against Apple.

*Second,* Apple cannot know whether its otherwise lawful processing of a transaction has "become unlawful" (ER-79) without monitoring hosted content. Unlike the developer of a rental website, Apple runs a general-purpose platform. So Apple would need to look inside each app to determine whether it offers games, whether the games resemble casinos, whether they include virtual slots, whether a player can exchange virtual currency for virtual spins, and even whether "substantially all" such in-app currency will be used for that purpose (rather for anything else)—and to block or remove the apps or games whenever the user is located in a State where such content is allegedly illegal. Accordingly, unlike in *HomeAway*, Apple would

need to "monitor[] such content" to avoid liability. *Internet Brands*, 824 F.3d at 851.

*HomeAway* involved online rental websites that merely needed to do the same things as offline rental agents: look at the address of the unit and perform the same cross-referencing to the city's registry. By contrast, the duty here would require Apple to engage in immense efforts that would parallel—but vastly exceed—the duty of a publisher to review the contents of each and every publication.

Apple could only determine whether a particular app includes games that resemble gambling by reviewing the content of every single app on the platform. And that is just the start. Each of the apps allegedly "contain[s] multiple games. For example, the DoubleDown Casino app contains over 200 total titles: 186 slot titles, 21 card game titles, and 1 bingo title." ER-151 (¶ 56). So Apple would need to monitor which of the hundreds of games each user is playing, inside dozens of apps, at all times. Moreover, the Complaint alleges that playing certain games within those apps is illegal only in 16 States. *See* p.11 & n.3, *supra*. So Apple would need to monitor where each user is physically located at the time they are playing those games. *See* ER-160 (¶ 99) ("Apple has not taken steps to limit access to the Illegal Slots, such as by geo-restricting games such that they can only be played in certain states.").

The duty to monitor that Plaintiffs seek to impose also cannot be cabined to so-called "social-casino" apps. Rather, Plaintiffs' legal theory about Section 230 is limitless. Thousands of apps offer virtual currency for myriad uses. *See* ER-119-24. Moreover, if Apple could potentially face liability by providing neutral tools for in-app transactions, so long as a person could later use that in-app content inside a third-party app in a way that is allegedly illegal in any jurisdiction, then processing *any* transaction for in-app content on any app could potentially expose Apple to legal risk. So Apple would need to monitor every user's location and behavior inside every such app at all times. That goes far beyond monitoring. That would be Orwellian.

This case is thus fundamentally unlike *HomeAway*. Instead, it is like *Perfect 10*. There, this Court held that a platform does not become liable for allegedly tortious third-party content in a case in which the platform "allow[ed] consumers to use credit cards or checks to pay for subscriptions" to access that content. *Perfect 10*, 488 F.3d. at 1108, 1119. As here, the duty to forbear from processing payments (for subscriptions) depended on hosted content (the content of the hosted images). If the content were to change, liability would disappear. So compliance with that duty would require the platform to review the hosted content and block or remove content if it is potentially objectionable. There, as here, the claim treats the platform as the publisher.

### 3. Allowing Plaintiffs' claims to proceed would undermine Congress's stated purposes in enacting Section 230

Plaintiffs' effort to use Apple's in-app purchase mechanism to circumvent Section 230 would also contravene Congress's stated purposes: "promot[ing] the continued development of the Internet and other interactive computer services"; "preserv[ing] the vibrant and competitive free market that presently exists for the Internet" "unfettered by Federal or State regulation"; and "remov[ing] disincentives for the development and utilization of blocking and filtering technologies." 47 U.S.C. 230(b)(1) to (4).[9]

In particular, Congress sought to avoid the "monitor's dilemma." Before Section 230, courts had held that platforms were not liable for third-party content if they never engaged in monitoring, *e.g.*, *Cubby, Inc. v. CompuServe Inc.*, 776 F. Supp. 135, 141-43 (S.D.N.Y. 1991), but could become liable if they monitored content to remove offensive posts, yet failed to block or remove the allegedly tortious content at issue, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, at *4-5 (N.Y. Sup. Ct. May 24, 1995). Efforts to protect users from offensive content were thus used as a sword to hold platforms liable, creating a perverse incentive to (1) weaken or abandon monitoring (making platforms less safe); or (2) unduly restrict third-party content (thus impeding creativity). Either way, the public would lose.

---

[9] Section 230's enacted statement of findings and policy are appropriate tools for determining the statute's breadth. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 29 (2010).

53

Congress responded by enacting Section 230 to avoid that dilemma and thus to protect the broader public interest. *See* H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.) (describing it as a "specific purpose[]" of Section 230 to override *Stratton Oakmont*).

If not dismissed, Plaintiffs' Complaint would put Apple to the very dilemma Congress enacted Section 230 to eliminate. Remarkably, the Complaint is open about the point. The Complaint asserts that that, "[p]rior to being published in the Apple App Store, developers must submit their app for review." ER-157 (¶ 82). It alleges that apps "may be, and often are, removed at Apple's discretion." ER-157 (¶ 82). Yet the Complaint charges that Apple "*did not remove* social casinos from [its] offerings" but instead "continue[s] to offer" them (ER-159 (¶ 98) (emphasis added)), and that "Apple has not taken steps to limit access," "such as by geo-restricting games such that they can only be played in certain states," which Apple allegedly does "regularly" for real-money gambling (ER-160 (¶ 99); *see also* ER-71). The Complaint even faults Apple for taking steps to protect minors (categorizing the Apps as "17+, indicating that the games are not appropriate for minors") (ER-157 (¶ 85)), which Plaintiffs contend were insufficient.

Plaintiffs are thus using Apple's efforts to maintain the safety of the App Store—including efforts to geo-restrict certain content and to protect

54

minors—as a sword to hold Apple liable for third-party content that remains on the App Store. That approach would create a perverse incentive for Apple (1) to adopt more restrictive monitoring (thus making the App Store less vibrant); or (2) to weaken its monitoring efforts, so that it cannot be faulted for excluding only some (but not all) objectionable content. Whatever choice Apple makes would expose it to yet more litigation.

Congress also made clear that platforms should have breathing room to develop monitoring tools and technologies without facing risk of liability. Congress sought to promote the "continued development" of the Internet and to preserve a "vibrant and competitive free market" for Internet services, "unfettered by Federal or State regulation." 47 U.S.C. 230(b)(1) and (2). The App Store is a prime example of Section 230's success. The iPhone and App Store together revolutionized the Internet, by making millions of third-party applications available to users in the palm of their hands. *See Pepper*, 139 S. Ct. at 1519. Apple has invested enormous resources to ensure that the App Store is safe and secure, including by reviewing all apps and requiring that developers block their own apps in places where their own content may be unlawful. *See* p.51, *supra*. Apple also competes with other platforms (including Google and Meta) in part through their different approaches to monitoring. *Cf. Epic Games*, 67 F.4th at 987 ("[U]sers are free to decide which kind of app-transaction platform to use. Users who value

security and privacy can select (by purchasing an iPhone) Apple's closed platform."). As Congress intended, the public is the ultimate beneficiary of this competition.

Plaintiffs are asking the Judiciary to second-guess Apple's carefully crafted system for reviewing apps, and are demanding that all platforms adopt a one-size-fits-all approach to monitoring. Under Section 230, however, it is up to platforms—not plaintiffs—to determine how best to monitor third-party content, as platforms are "perforce immune" for failing to block or remove content. *E.g.*, *Roommates*, 521 F.3d at 1171. Plaintiffs' contrary approach, moreover, would involve centralized control, not a free market "unfettered by … State regulation."47 U.S.C. 230(b)(1) and (2).

Finally, Plaintiffs' approach would undermine the purpose of promoting the "continued development" of content and to preserve a "vibrant and competitive" internet. 47 U.S.C. 230(c)(1) and (2). By attacking Apple's provision of tools that enable content creators to monetize their work, Plaintiffs' approach would create an incentive for Apple to prevent developers from creating paid apps, selling subscriptions, or selling in-app items. And preventing content creators from monetizing their efforts would undermine the incentive to create innovative content in the first place—and the incentive to create groundbreaking platforms like the App Store itself.

The Complaint thus faults Apple for making the kinds of choices Congress enacted Section 230 to protect. It would replace Apple's carefully curated and platform-specific methods of monitoring content with a one-size-fits-all approach. That approach would create grave privacy problems, diminish competition and consumer choice, undermine incentives to create, and handcuff the operation of pioneering platforms like the App Store. Those are telltale signs that the Complaint seeks to treat Apple as the publisher of third-party content.

### 4. The district court's contrary conclusion is unfounded

To conclude that Plaintiffs' "payment processing" claims are not precluded, the district court relied on Plaintiffs' argument that "the Platforms['] role as a 'bookie' is illegal." ER-35. Based on that characterization, the court reasoned that this theory of liability is "grounded in the Platforms' own bad acts," and analogized it to claims this Court found actionable in *HomeAway* and *Gonzalez*. ER-35. But the Complaint *does not allege* that Apple is a "bookie" and the actual allegations establish that Apple is not a bookmaker. As a result, the claims do not depend on Apple's "bad acts," but instead on third-party content. *HomeAway* and *Gonzalez* are both accordingly inapposite.

*First*, the word "bookie" does not appear in the Complaint. Plaintiffs used that term only as attorney argument to characterize their contentions,

asserting that the "Platforms act essentially as bookies for online casinos." ER-51. The qualifier "essentially" is a tip-off. Even Plaintiffs' counsel cannot say in good faith that Apple actually *is* a bookie. Instead, the factual allegations in the Complaint establish that Apple was *not* a "bookie." This Court is, of course, bound by the allegations in the Complaint—not after-the-fact attorney arguments.

A "bookmaker" is "[s]omeone who determines odds and receives bets on the outcome of events, esp. sports events, and pays out to winners." *Bookmaker*, Black's Law Dictionary (11th ed. 2019); *see also*, *e.g.*, Ala. Code § 13A-12-20(2) (defining "bookmaking" as "unlawfully accepting bets from members of the public as a business, rather than in a casual or personal fashion, upon the outcome of future contingent events."); Mo. Ann. Stat. § 572.010(2) (same); N.Y. Penal Law § 225.00(9) (same). The Complaint does not allege that Apple determined odds, took bets on any contingent event, or paid out money—real or virtual—to any "winners." Apple is thus no "bookie." Rather, the Complaint alleges that the *developer* determines odds, takes "bets," and "distributes" virtual currency to "winners." *See* pp.42-43, *supra* (collecting allegations).

Apple also does not act as a "bookie" in allegedly processing the distinct transaction to purchase virtual chips. That transaction does not involve bets, odds, or contingent events. Users get "exactly what they bargained

for—gambling 'chips' with which they [can] place wagers." *In re Mastercard*, 313 F.3d at 264. Moreover, Apple does not even sell the "chips." Developers "sell[] 'in-game' items." ER-144 (¶ 2, n.2). Apple allegedly "operates as the payment processor." ER-152 (¶ 63). The Complaint thus fails to allege a "bad act" of Apple's own, independent of third-party content.

*Second,* and relatedly, Plaintiffs' payment-processing theory is fundamentally unlike the theories this Court found actionable in *HomeAway* and *Gonzalez. HomeAway* is distinguishable for reasons discussed above: the duty there did not depend on hosted content, and the developers did not need to monitor hosted content to comply. Here, by contrast, Apple's otherwise lawful payment processing tools would become unlawful only depending on third-party content, namely, the content of the app, game, and the in-app currency and its in-app uses. To avoid liability, Apple would need to engage in pervasive monitoring, including tracking users' locations as they move around the country. *See* pp.47-52, *supra.*

The Supreme Court has vacated *Gonzalez*, so it is no longer binding precedent. *See* p.35, n.5, *supra.*[10] Plaintiffs cannot rely on it to defend the

---

[10] The Supreme Court vacated *Gonzalez* in light of *Twitter,* which held that a neutral platform does not become liable for aiding and abetting harms allegedly caused by third-party content, when it is aware that third-parties are using the platform for illegal purposes. 143 S. Ct. at 1226-29. If this Court were to decline to dismiss this entire case, *Twitter* would provide an additional basis for the district court on remand to dismiss the Complaint

decision below. In any event, the revenue-sharing theory this Court found actionable in *Gonzalez* is readily distinguishable.

In *Gonzalez*, the families of victims of ISIS terrorist attacks sued Google, alleging that Google was liable because it shared advertising revenue with ISIS when people watched ISIS videos on YouTube (which Google owns). The plaintiffs alleged that sharing revenue with a designated terrorist group qualified as material support for terrorism, in violation of federal law. 2 F.4th at 897-98. The alleged illegality thus was "*giving ISIS money.*" *Id.* at 898. This Court determined that Section 230 did not foreclose that theory of liability because that duty "does not depend on the particular content ISIS places on YouTube." *Id.* at 898. Rather, the claims were "solely directed to Google's unlawful payments of money to ISIS." *Id.* ISIS could have been posting videos about cats, baking, or anything else. The duty was simply to refrain from giving money to terrorists.

The developers here are not "designated … foreign terrorist organization[s]," 18 U.S.C. 2333(d)(2), and the Complaint does not allege that it is unlawful merely to give them money. Moreover, unlike real-world terrorists, the in-app chips, slots, and casinos are all "information provided by

---

under Rule 12(b)(6). The court on remand also could conclude that it is not even illegal "gambling" to exchange virtual currency for virtual spins, when a player cannot cash out and additional virtual currency can be obtained, for free, by waiting. For any number of reasons, all causes of action against Apple should be dismissed for failure to state a claim.

another information content provider." 47 U.S.C. 230(c)(1); *see* p.43, *supra*. Plaintiffs do not—and cannot—allege that Apple owes a duty that is independent of that content. As a result, Apple would need to monitor, block, and remove hosted content to avoid potentially debilitating liability. The revenue-sharing theory in *Gonzalez* therefore is fundamentally different.

Plaintiffs' "payment processing" theory thus would treat Apple as the publisher of third-party content on the App Store. Accordingly, all of the causes of action in the Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should reverse the order certified for interlocutory review and remand with instructions to dismiss the Complaint with prejudice.

Respectfully submitted,

Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*s/ Mark A. Perry*

Mark A. Perry
Zachary D. Tripp
Crystal L. Weeks
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

*Counsel for Apple Inc.*

July 24, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that this brief complies with the word limit of Circuit Rule 28.1-1(b) because it contains 13,913 words, excluding the portions exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*s/ Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

July 24, 2023

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6, Defendant-Appellant Apple Inc. identifies *In re Google Play Store Simulated Casino-Style Games Litig.*, Nos. 22-16921, 22-16923, and *In re: Facebook Simulated Casino-Style Games Litig.*, Nos. 22-16888, 22-16889, as related appeals that were coordinated in the district court and raise the same or closely related issues.

*s/ Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

July 24, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*s/ Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

July 24, 2023

# ADDENDUM

**47 U.S.C. § 230.**

**Protection for private blocking and screening of offensive material.**

**(a) Findings**

The Congress finds the following:

> **(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

> **(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

> **(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

> **(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

> **(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States—

> **(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

> **(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

### (1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

### (2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

### (3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

### (4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

> **(A)** any claim in a civil action brought under section 1595 of title 18, United States Code, if the conduct underlying the claim constitutes a violation of section 1591 of that title;
>
> **(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18, United States Code; or
>
> **(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, United States Code, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of

information provided through the Internet or any other interactive computer service.

## (4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.